UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GATER ASSETS LIMITED,

                Plaintiff-Assignee,

   -against-

AO GAZSNABTRANZIT,
AO MOLDOVAGAZ, and the
REPUBLIC OF MOLDOVA,

              Defendants.

16 Civ. 4118 (LAP),
Related to: 99 Civ. 11962
(LAP)

**CORRECTED PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT AO MOLDOVAGAZ'S MOTION TO DISMISS THE RENEWAL
ACTION AND ITS MOTION TO VACATE THE 2000 JUDGMENT**

DECHERT LLP
Dennis H. Hranitzky
G. Eric Brunstad, Jr.
May K. Chiang
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Plaintiff-Assignee
Gater Assets*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................. 1

FACTUAL BACKGROUND .............................................................. 3

PROCEDURAL HISTORY.................................................................. 6

THE RELEVANT LEGAL STANDARDS................................................ 11

ARGUMENT ................................................................................... 12

I.    MOLDOVAGAZ'S MOTION TO VACATE THE 2000 JUDGMENT IS
      UNTIMELY............................................................................. 12

II.   THE COURT HAD SUBJECT MATTER JURISDICTION TO ENTER THE
      2000 JUDGMENT AND CONTINUES TO HAVE SUBJECT MATTER
      JURISDICTION OVER BOTH ACTIONS TODAY. .............................. 13

      A.    Moldovagaz Meets The Criteria For A State Organ Under The Filler Test. ....... 14

            1.   Moldova Created Moldovagaz For A National Purpose......................... 15

            2.   Moldova Supervises Moldovagaz............................................ 17

            3.   Moldova Directs Moldovagaz To Hire Moldovan State Employees
                 And Pays Those Employees' Salaries...................................... 19

            4.   Moldovagaz Enjoys A Monopoly Over The Transport,
                 Distribution And Sale Of Natural Gas Within Moldova. ................ 19

            5.   Moldovagaz Is Defined As A State Organ Under Moldovan Law. ......... 20

            6.   The Fact That Moldova Does Not Own A Majority Of The Equity
                 In Moldovagaz Is Irrelevant.............................................. 21

      B.    These Cases Fall Within The Arbitration And Implied Waiver Exceptions
            To Sovereign Immunity .................................................... 21

            1.   These Actions Relate To The Confirmation Of An Arbitral
                 Award Made Pursuant To The New York Convention ................... 22

            2.   Moldovagaz Is Bound By Gazsnabtranzit's Agreement To
                 Arbitrate ................................................................ 24

            3.   Moldovagaz Implicitly Waived Sovereign Immunity As
                 Gazsnabtranzit's Successor-In-Interest And By Binding Itself
                 To The Underlying Contact .............................................. 25

III.  THE COURT HAS PERSONAL JURISDICTION OVER MOLDOVAGAZ IN
      BOTH ACTIONS. ...................................................................... 28

      A.    Moldovagaz Was Properly Served With Process In Both The 1999 Action
            and The 2016 Action....................................................... 29

            1.   Service Of The 2016 Complaint Was Proper ........................... 30

## TABLE OF CONTENTS
(continued)

**Page**

       2.     Service Of The 1999 Petition Was Also Proper ...................................... 33

    B.    The "Minimum Contacts" Test Under the Due Process Clause Does Not Apply to Moldovagaz .......................................................................................... 33

IV.   MOLDOVAGAZ'S FORUM NON CONVENIENS ARGUMENT FAILS AS A MATTER OF LAW ................................................................................................... 37

CONCLUSION ....................................................................................................................... 40

# TABLE OF AUTHORITIES

CASES

*A.I. Trade Fin., Inc. v. Petra Bank*,
    989 F.2d 76 (2d Cir. 1993)................................................................12

*Albany Ins. Co. v. S/S "MAR ESMERALDA"*,
    No. 91 Civ. 1379 (MJL), 1992 WL 233875 (S.D.N.Y. Sept. 4, 1992)............................37, 38

*Badian v. Brandaid Commc'ns Corp.*,
    No. 03 CIV. 2424 (DC), 2005 WL 1083807 (S.D.N.Y. May 9, 2005) ...................14

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
    735 F.3d 72 (2d Cir. 2013)................................................................13

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
    No. 95 Civ. 8833, 1998 WL 158958 (S.D.N.Y. April 2, 1998).............................18

*Burda Media, Inc. v. Viertel*,
    417 F.3d 292 (2d Cir. 2005).............................................................11, 31

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).....................................................................36

*Campagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation*,
    361 F.3d 676 (2d. Cir. 2004)...........................................................26, 27

*Circus Prods., Inc. v. Int'l Impresarios, Inc.*,
    No. 90 CIV. 0414 PKL, 1990 WL 55684 (S.D.N.Y. Apr. 26, 1990) .....................24

*Commercial Bank of Kuwait v. Rafidain Bank*,
    15 F.3d 238 (2d Cir. 1994)..............................................................14

*Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*,
    801 F. Supp. 2d 211 (S.D.N.Y. 2011)...................................................38, 39

*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-
    Exploracion Y Produccion*,
    832 F.3d 92 (2d Cir. 2016), *cert. dismissed*, 137 S. Ct. 1622 (2017) ...........3, 28, 36

*Crescendo Mar. Co. v. Bank of Commc'ns Co.*,
    No. 15 CIV. 4481 (JFK), 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016)...........................38, 39

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014), *rev'd and remanded on other grounds*,
    136 S. Ct. 2090 (2016).................................................................18, 21

# TABLE OF AUTHORITIES

*Export Import Bank of the Republic of China v. Central Bank of Liberia*,
No. L: 15-cv-09565, 2017 WL 1378271 (S.D.N.Y. April 12, 2017),
*appeal filed*, No. 17-1325 (2d. Cir.).................................................................26

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
665 F.3d 384 (2d Cir. 2011).........................................................................38

*Filler v. Hanvit Bank*,
378 F.3d 213 (2d Cir. 2004)................................................................ *passim*

*First Nat'l City Banco Para el Comercio Exterior de Cuba (Bancec)*,
462 U.S. 611 (1983) .............................................................................17, 35

*FRC Int'l, Inc. v. Taifun Feuerloschgeratebau und Vertriebs GmbH*,
No. 3:01 CV 7533, 2002 WL 31086104 (N.D. Ohio Sept. 4, 2002) ................................30, 31

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009)...........................................................28, 29, 34, 35

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
479 F. Supp. 2d 376 (S.D.N.Y. 2007), *vacated and remanded on other
grounds*, 582 F.3d 393 (2d Cir. 2009) .................................................................23

*Garg v. Winterthur*,
525 F. Supp. 2d 315 (E.D.N.Y. 2007) .................................................................31

*Grady v. Grady*,
No. 10-CV-8809 (CS), 2015 WL 5052663 (S.D.N.Y. Aug. 26, 2015) ...................................11

*GSS Group Ltd. v. Nat'l Port Authority*,
680 F.3d 805 (D.C. Cir. 2012).........................................................................36

*Harrison v. Republic of Sudan*,
802 F.3d 399 (2d Cir. 2015)...........................................................................29

*In re Air Crash Off Long Island New York, on July 17, 1996*,
65 F. Supp. 2d 207 (S.D.N.Y. 1999)...................................................................39

*In re Aluminum Warehousing Antitrust Litig.*,
No. 13-md-2481 (KBF), 2014 WL 5801607 (S.D.N.Y. Nov. 7, 2014)....................................21

*In re Terrorist Attacks on September 11, 2001*,
538 F.3d 71 (2d Cir. 2008), *abrogated on other grounds by
Samantar v. Yousuf*, 560 U.S. 305 (2010)..............................................................15

## TABLE OF AUTHORITIES

*In re Vitamin C Antitrust Litig.*,
    837 F.3d 175 (2d Cir. 2016), *cert. granted sub nom.*
    *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, No. 16-1220,
    2018 WL 386563 (U.S. Jan. 12, 2018) ...................................................................17

*Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*,
    160 F. Supp. 2d 722 (S.D.N.Y. 2001)...................................................................39

*Jifry v. F.A.A.*,
    370 F.3d 1174 (D.C. Cir. 2004) .............................................................................34

*Kirschenbaum v. 650 Fifth Ave.*,
    257 F. Supp. 3d 463 (S.D.N.Y. 2017)...............................................................20, 21

*Lippus v. Dahlgren Mfg. Co.*,
    644 F. Supp. 1473 (E.D.N.Y. 1986) .....................................................................24

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000).................................................................................12

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. For
    Contemporary Dance, Inc.*,
    466 F.3d 97 (2d Cir. 2006)...................................................................................13

*Mende v. Milestone Tech., Inc.*,
    269 F. Supp. 2d 246 (S.D.N.Y. 2003)....................................................................12

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
    863 F.3d 96 (2d Cir. 2017).............................................................................24, 28

*Monegasque de Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*,
    158 F. Supp. 2d 377 (S.D.N.Y. 2001)....................................................................38

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)...........................................................................................36

*Murphy v. Korea Asset Mgmt. Corp.*,
    421 F. Supp. 2d 627 (S.D.N.Y. 2005), *aff'd*, 190 F. App'x 43 (2d Cir. 2006)............... *passim*

*Orix Fin. Servs. v. 1st Choice Freight Sys., Inc.*,
    No. 03 Civ. 9296 (RMB), 2006 WL 2168332 (S.D.N.Y. July 31, 2006)...............................33

*Orix Fin. Servs v. Phipps*,
    No. 91 Cv. 2523 (RPP), 2009 WL 2486012 (S.D.N.Y. Aug. 14, 2009) ................................33

# TABLE OF AUTHORITIES

*PDK Labs., Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997)..............................................................12

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
   182 F.3d 17 (D.C. Cir. 1999)..............................................................35

*Porzig v. Dresdner Kleinwort Benson N. Am. LLC*,
   No. 98 CIV. 7670 (BJS), 1999 WL 518833 (S.D.N.Y. July 21, 1999) ................................24

*Rasoulzadeh v. Associated Press*,
   574 F. Supp. 854 (S.D.N.Y. 1983) ........................................................37

*Rasul v. Myers*,
   563 F.3d 527 (D.C. Cir. 2009)..............................................................34

*Robinson v. Gov't of Malaysia*,
   269 F.3d 133 (2d Cir. 2001)..............................................................12

*Rodriguez v. Mitchell*,
   252 F.3d 191 (2d Cir. 2001)..............................................................13

*Seetransport Wiking Trader Schiffarhtsgesellschaft MbH & Co. v. Navimpex
   Centrala Navala*,
   989 F.2d 572 (2d. Cir.1993)..............................................................26, 27

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
   198 F.3d 88 (2d Cir. 1999)..............................................................23

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
   374 F.3d 158 (2d Cir. 2004)..............................................................11

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007)..............................................................23

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005)..............................................................35

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*,
   241 F.3d 135 (2d Cir. 2001)..............................................................23

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990)..............................................................34, 35, 36

# TABLE OF AUTHORITIES

**CONSTITUTIONS, TREATIES, STATUTES & RULES**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
9 U.S.C. §§ 201 et seq...................................................................................................22, 23

Fed. R. Civ. P. 4(c) ........................................................................................................31

Fed. R. Civ. P. 12(b) ........................................................................................................1

Fed. R. Civ. P. 60(b) ......................................................................................................11,

Fed. R. Civ. P. 60(c) ...................................................................................................12, 13

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-11 ........................................ *passim*

Hague Convention, Nov. 17, 1965, 20 U.S.T. 361 .......................................................30

U.S. CONST. amend. V. ..................................................................................................33

Plaintiff Gater Assets ("**Plaintiff**" or "**Gater**") respectfully submits this consolidated memorandum in opposition to Defendant AO Moldovagaz's (1) motion to vacate the Court's July 17, 2000 judgment (the "**2000 Judgment**") pursuant to Fed. R. Civ. P. 60(b)(1), (4) and (6) in *Gater Assets v. AO Gazsnabtranzit*, Case No. 99 Civ. 11962 (the "**1999 Action**"); and (2) its motion to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1), (2) and (5) in the action to renew the 2000 Judgment *Gater Assets v. AO Gazsnabtranzit*, Case No. 16 Civ. 4118 (the "**Renewal Action**").

## PRELIMINARY STATEMENT

Nearly 19 years ago, Lloyd's Underwriters commenced the 1999 Action seeking recognition and enforcement of an arbitral award for $8,548,965 against a Moldovan state organ called AO Gazsnabtranzit ("**Gazsnabtranzit**"). Because AO Moldovagaz ("**Moldovagaz**") inherited all of Gazsnabtranzit's rights and obligations when it was formed out of Gazsnabtranzit in 1998, Lloyd's also named Moldovagaz in the 1999 Action. Importantly, Moldovagaz has known about this litigation from the beginning—having been properly served with process in 1999, and having participated in litigation in a Moldovan court aimed at rendering the arbitral award unenforceable in the Republic of Moldova ("**Moldova**"), in which the papers from the 1999 Action was part of the record. Yet for virtually all of the time this litigation was pending—through entry of a renewal judgment in Gater's favor in 2017—Moldovagaz knowingly stayed out of it. Now, almost 19 years on, it asks the Court to reconsider its well-supported 2000 Judgment. But after sleeping on its rights for so many years, its request that the Court revisit the findings underlying that judgment and vacate the judgment under Rule 60(b) is both untimely and patently unreasonable.

Although Moldovagaz claims its delay is excused because the Court lacked subject matter and personal jurisdiction to enter the 2000 Judgment, its position does not withstand

1

scrutiny.  As the Court correctly determined when it entered that judgment, it had (and has) subject matter jurisdiction over these actions under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-11 (the "**FSIA**"), which is the exclusive source of jurisdiction in actions involving claims against a sovereign state, agency, instrumentality or organ.  It is clear from the record that Moldovagaz is an organ of the Moldovan state.   Among other things, it was formed for the national purposes of transporting, distributing, and selling natural gas in Moldova— indeed, it enjoys a legal monopoly over these activities.  And it is utterly dominated by Moldova, which appoints a majority of the members of its Management Board, as well as a representative on its Supervisory Board who wields the power to cancel or reverse any decision of Moldovagaz's management, directors or stockholders that Moldova does not like.  Furthermore, these cases fall within both the "arbitration" and "waiver" exceptions to sovereign immunity under section 1605 of the FSIA because (1) they relate to the enforcement of an arbitral award governed by the New York Convention, (2) Gazsnabtranzit implicitly waived its sovereign immunity when it agreed to arbitrate the underlying dispute knowing that any award that resulted could be enforced in the United States courts, and (3) Moldovagaz is bound by that waiver both as Gazsnabtranzit's successor-in-interest, and because it signed on in its own right to to the arbitration clause after the arbitration had already commenced.

Having established that Moldovagaz is an organ of Moldova and that the Court has subject matter jurisdiction under the FSIA, the Court's personal jurisdiction depends only on whether Moldovagaz was served with process in compliance with the FSIA.  And the Court has already determined that service on Moldovagaz in both of these actions was proper.  As a foreign corporation (and state organ) that admittedly has no contacts with the United States apart from this litigation, Moldovagaz is not entitled to any additional protections deriving from the Due

Process Clause.  *See Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 102 (2d Cir. 2016) ("The jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'"), *cert. dismissed*, 137 S. Ct. 1622, 197 L. Ed. 2d 746 (2017).  The fact that Moldovagaz lacks "minimum contacts" with the United States is therefore irrelevant to the Court's personal jurisdiction.

Finally, Moldovagaz's does not even attempt to meet its burden of showing that the courts of Moldova or the Russian Federation would be a more appropriate forum for these actions than this Court.  Nor could it with respect to Moldova, given that Moldovagaz itself procured an order from a Moldovan court that expressly prohibits enforcement of the arbitral award (or and judgment derived from it) there.  But even if Moldovagaz could meet make this mandatory showing, its *forum non conveniens* argument would nonetheless fail in light of its 17 year delay in seeking such relief.  Moldovagaz's motions should therefore be denied.

## FACTUAL BACKGROUND

Moldovagaz is Moldova's national gas distribution organ, and enjoys a domestic monopoly over the transportation, distribution, and sale of natural gas in Moldova.  Aff. of Professor William E. Butler ¶¶ 28, 40 (Jan. 19, 2018) ("**Butler Aff.**");[1] Declaration of Dennis Hranitzky, dated January 25, 2018 ("**Hranitzky Decl.**"), Ex. 1 (JSC Moldovagaz Press Release (Sept. 18, 2010)); Ex. 2 (Decision of the Ministerial Council of the Energy Community (Dec. 5,

---

[1]   A leading expert on the legal systems of post-Soviet Union jurisdictions including Moldova, Professor William E. Butler is the John Edward Fowler Distinguished Professor of Law at Dickinson School of Law at Pennsylvania State University and Emeritus Professor of Comparative Law at the University of London.  Butler Aff., Ex. 1 (Curriculum Vitae).  He is licensed to practice law in the United States, the Russian Federation, and Uzbekistan, has served as member of the Russian International Court of Commercial Arbitration, and has advised the Russian Federation, the government of Lithuania, the European Commission Joint Task Force on Law Reform in the Independent States, and the World Bank.  *Id.*  He is the same expert who submitted a sworn affidavit in the 1999 Action.  Butler Aff. ¶ 10; see 1999 D.E. 18, Ex. D (Butler Aff. (March 27, 2000)).

2012)).  It also transports gas from Moldova to other countries (not including the United States),

and holds the exclusive right to maintain all gas pipelines in Moldova, irrespective of who owns

the pipelines.  Butler Aff. ¶¶ 29, 41.

Moldovagaz is described as an "organ" of the Moldovan state responsible for the

administration of the unified gas supply system as well as the "important state object" of pipeline

maintenance within Moldova.  *See* Butler Aff. ¶¶ 27, 42, Ex. 11 (Edict No. 140 ¶ 1 (May 18,

1994)) and Ex. 20 (Constitutional Court Decision No. 17 (June 19, 2007)).[2]  Moldova created

Moldovagaz in 1998 through the state-compelled merger of various state-run enterprises

including Gazsnabtranzit and State Concern Moldovagaz ("**SCM**").  *Id.* ¶¶ 18-19.  As a result of

the merger, under Moldovan law Moldovagaz inherited all of the rights, obligations and

functions of its predecessor entities.  Butler Aff. ¶¶ 22 and Ex. 13 (Moldovan Civil Code, Art.

73.2).  Among the obligations Moldovagaz inherited were SCM's obligation to supply gas in

Moldova under various contracts, and Gazsnabtranzit's obligation to pay certain debts that

Moldova owed to Russia.  Butler Aff. ¶¶ 14, 20-22.

Of particular relevance to these actions, the state-ordered merger that created

Moldovagaz caused Moldovagaz to inherit Gazsnabtranzit's obligation under a December 30,

1996 contract with the Public Joint Stock Company Gazprom ("**Gazprom**")[3] called Contract No.

1 GM-97 (the "**Underlying Contract**") to purchase an allotted amount of natural gas from

---

[2]   The Constitutional Court of Moldova is the final arbiter of the constitutionality of Moldovan laws, and its
decisions are binding on the other branches of government.  Hranitzky Decl., Ex. 3 (Constitutional Court of
Moldova).

[3]   "Gazprom is a global energy company focused on geological exploration, production, transportation, storage,
processing and sales of gas, gas condensate and oil, sales of gas as a vehicle fuel, as well as generation and
marketing of heat and electric power." Hranitzky Decl., Ex. 4 (About Gazprom, Gazprom,
http://www.gazprom.com/about/ (last visited Jan. 24, 2018)).  Gazprom and its subsidiaries "are responsible for
the major part of gas production and high pressure gas transportation in the Russian Federation," and are "also a
major supplier of gas to European countries."  The Government of the Russian Federation holds over 50% of
the equity in Gazprom.  *Id.*

Gazprom and deliver the gas throughout Moldova.  Butler Aff. ¶ 23 and Ex. 6 ¶¶ 1.1, 1.2

(Underlying Contract).  Gazsnabtransit breached the Underlying Contract by consuming more

than its allotment of gas in the first quarter of 1997 without paying for the additional gas.  1999

D.E. 1, Ex. 2 (Arbitral Award (November 12, 1998)); *see also* 2016 D.E. 1, Ex. 1 (same).[4]  The

matter went to arbitration because the Underlying Contract contained an agreement to arbitrate

disputes arising from the contract before the International Commercial Arbitration Court of the

Chamber of Commerce of the Russian Federation in Moscow ("**ICAC**").  *See* Butler Aff., Ex. 15

(Underlying Contract, Art. 7.2 (Dec. 30, 1996)).  In addition to inheriting Gazsnabtranzit's

obligations under the Underlying Contract through the merger, Moldovagaz executed an

addendum to that contract on September 22, 1999, acceding to all rights and obligations of

Gazsnabtranzit arising under the contract—including the agreement to arbitrate.  Butler Aff. ¶ 25

and Ex. 16 (Underlying Contract. Addendum 6 (Sept. 22, 1999)).

Moldovagaz is run by a Supervisory Board and a Management Board and is overseen by

an Audit Committee.  Butler Aff. ¶ 31, Ex. 14 (Moldovagaz Charter), and Ex. 22 (Moldovagaz

Controls).  Under Decree 1053 and the Moldovagaz Charter, Moldova appoints representatives

to these bodies to "represent and defend the rights and legal interests of [Moldova]."  Butler Aff.

¶¶ 31, 39 n.6 and Ex.  21 (Decree No. 1053 ¶ 4 (Nov. 11, 2010)).

The Management Board of Moldovagaz is the executive body generally charged with the

company's management.  Butler Aff., Ex. 14 (Moldovagaz Charter, Art. 48).  Moldova appoints

the Chairman of Moldovagaz's Management Board—currently Vasile Botnari, the former

Minister of Information Technologies and Communications of Moldova.  *See* Butler Aff. ¶ 32,

Ex. 14 (Moldovagaz Charter), and Ex. 17, ("IT Minister Vasile Botnari is the new head of

---

[4]     Citations to "**1999 D.E.**" refer to the record in the 1999 Action.  Citations to "**2016 D.E.**" refer to the record in the Renewal Action.

Moldovagaz," Moldovagaz.org).  In addition to the Chairman, Moldovagaz's Charter requires another five members of Moldovagaz's nine-member Management Board to be representatives of the Moldovan State.  Butler Aff. ¶ 31 and Ex. 14 (Moldovagaz Charter).

The Supervisory Board oversees Moldovagaz's Management Board and represents the interests of shareholders.  Butler Aff., Ex. 14 (Moldovagaz Charter, Art. 44).  Its powers include authority over corporate transactions and reorganizations, decisions about Moldovagaz's charter capital, and calling meetings of Moldovagaz's general shareholders.  *Id*.  Two Moldovan state employees serve on Moldovagaz's six-person Supervisory Board—one of whom, pursuant to Decree No. 1053, holds a "super power" on behalf of Moldova to cancel or reverse any decision of Moldovagaz's executive management, management board, council of directors, or stockholders of Moldovagaz.  Butler Aff. ¶ 30, Ex. 21 (Decree No. 1053 ¶ 21 (Nov. 11, 2010)), Ex. 22 (Moldovagaz Controls).  Vitalie Iurcu, the Deputy Minister of Economy of Moldova, currently sits on the Supervisory Board and holds this super power.  Butler Aff. ¶ 33 and Ex. 22 (Moldovagaz Controls).

Two Moldovan state employees—currently Mr. Mamei and Ms. Demidchenko—serve on Moldovagaz's three-person Audit Commission.  Butler Aff. ¶ 34 and Ex. 22 (Moldovagaz Controls).  Both of these individuals serve concurrently as Moldovan State officials:  Mr. Mamei as Department Head of the Moldovan Ministry of Economy, and Mrs. Demidchenko as Deputy Head of the Moldovan Ministry of Economy.  Butler Aff. ¶ 34.

## PROCEDURAL HISTORY

As noted in the preceding section, Gazsnabtranzit breached the Underlying Contract by consuming more gas than it was contracted to receive in the first quarter of 1997 and then failing to pay for the excess.  1999 D.E. 1, Ex. 2 (Arbitral Award (November 12, 1998)); 2016 D.E. 1, Ex. 1 (same).  Plaintiff's predecessor-in-interest, Lloyd's Underwriting ("**Lloyd's**"), was a

reinsurer of Gazprom's right to payment from Gazsnabtranzit under the Underlying Contract, and was therefore subrogated to Gazprom's rights under that contract.  1999 D.E. 1, Ex. 2 (Arbitral Award (November 12, 1998).  On September 26, 1997, following Gaznsabtranzit's breach of the Underlying Contract, Lloyd's commenced an arbitration seated in Moscow against Gazsnabtranzit before the ICAC.  1999 D.E. 1, Ex. 2 (Arbitral Award (Nov. 12, 1998)); 2016 D.E. 1, Ex. 1 (same).  On November 12, 1999, the tribunal rendered an arbitral award (the "**Arbitral Award**") awarding Lloyd's $8,548,965.00 in damages against Gazsnabtranzit.  *Id.*

On December 10, 1999, Lloyd's filed a petition in this Court seeking to confirm the Arbitral Award, (1999 D.E. 1 (Petition)), thereby commencing the 1999 Action.  Lloyd's served the petition on Moldovagaz through the Clerk of the Court in accordance with section 1603(b)(3) of the FSIA.  *See* 1999 D.E. 6 (Certificate of the Clerk of the Court filed March 9, 2000 (attesting to service by James M. Parkison, Clerk of the Court for the Southern District of New York)); 1999 D.E. 18 (Hardison Decl.),  ¶ 4 (attesting to service of the Petition, Summons, Notice of Suit, and Romanian translations of those documents on AO Moldovagaz).  On July 17, 2000 after Moldovagaz failed to appear in the 1999 Action, the Court entered a default judgment of $9,863,034.04, plus statutory interest against Respondents Gazsnabtranzit, its successor-in-interest Moldovagaz, and Moldova.  1999 D.E. 14 (2000 Judgment).

Remarkably, Moldovagaz did not appear in the 1999 Action until May 26, 2017—***nearly 17 years later***.  1999 D.E. 27 (Notice of Appearance).  Notwithstanding this late appearance, Moldovagaz in fact had actual knowledge of the Petition and the 2000 Judgment—as demonstrated by its involvement in a parallel proceeding brought in Moldova before the "Chisinau Tribunal": a court in the Moldovan capital city of Chisinau.  On February 9, 2000, the Moldovan State Chancery sent a letter to the Chairman of the Chisinau Tribunal enclosing

documents from this Court regarding the 1999 Action. Butler Aff., Ex. 24 (Ex. 3 to Levintsa Aff. (containing the Moldovan State Chancery's February 9, 2000 letter to the Chisinau Tribunal)). On January 15, 2001, following this Court's entry of the 2000 Judgment, the Civil Board of the Chisinau Tribunal issued a decision purporting to dismiss a petition from Lloyd's to enforce the Arbitral Award and ruling that the Arbitral Award cannot be enforced in Moldova. Butler Aff., Ex. 24 (Ex. 1 to Levintsa Aff. (Decision of Chisinau Tribunal (Jan. 15, 2001))). Setting aside concerns about the legitimacy of this proceeding (which Professor Butler addresses in his affidavit), it is clear from this opinion that a representative of Moldovagaz appeared before the Chisinau Tribunal and acknowledged Lloyd's petition. *Id.*

On August 6, 2012, Lloyd's assigned the 2000 Judgment to Gater. 1999 D.E. 22 (Notice of Assignment of Judgment). On June 2, 2016, Gater commenced the Renewal Action seeking renewal of the 2000 Judgment under New York CPLR § 5014. 2016 D.E. 1 (Complaint). The defendants in the Renewal Action are the judgment debtors listed in the 2000 Judgment: Gazsnabtranzit, Moldovagaz and Moldova.

This Court has already determined that Gater served Moldovagaz with the petition in 2016 in compliance with Section 1608(b) of the FSIA. *See* 2016 D.E. 26 (Order and Default Judgment (Jan. 26, 2017)) (stating a copy of the Summons and Complaint was served on Moldovagaz pursuant to 28 U.S.C. § 1608(b)(3)(B) and proof of service docketed by the Clerk of the Court).[5] Because there was no special arrangement for service of the petition on Moldovagaz, Gater first sought to serve Moldovagaz pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "**Hague**

---

[5]   As noted below at p. 11, the Renewal Judgment was vacated by agreement of the parties on September 22, 2017. 2016 D.E. 73 (Memo Endorsement). However, Gater respectfully submits that the Court's findings with respect to the propriety of service contained in the corresponding Order were correct.

**Convention**"), to which Moldova acceded on July 4, 2012.  2016 D.E. 23 (Affidavit of Charles R. Jacob III., dated December 15, 2016 ("**Jacob Aff.**") ¶¶ 20-25); Hranitzky Decl., Ex. 6 (Hague Convention Status Table).  In accord with Article 3 of the Hague Convention, on June 6, 2016 Gater sent three requests for service to the Moldovan Ministry of Justice—which is Moldova's designated "Central Authority" under the Convention.  *Id*. ¶¶ 25-26 and Ex. D (Aff. of Service (June 7, 2016)).  The Ministry of Justice did not return a certificate of service in response to this service attempt.  *Id*. ¶ 27.  Gater then made another attempt at service by sending a letter on August 11, 2016 to Minister Vladimir Cebotari at the Ministry of Justice and enclosing the same papers sent to the Central Authority.  *Id*. ¶¶ 28-29 and Ex. E (Aff. of Service (Aug. 12, 2016)).  The enclosed materials included Romanian translations of the Complaint and the accompanying papers and exhibits.  *Id*.  When Gater's letter to Minister Cebotari elicited no response, Gater made a third attempt at service through the Clerk of the Court, as contemplated under sections 1608(a)(3) and 1608(b)(3)(B) of the FSIA.  *Id*. ¶¶ 30-32.  On October 3, 2016, the Clerk of the Court mailed the service documents in both English and Romanian to Defendants.  *Id*. ¶ 33 and Ex. G. (2016 Action Docket Sheet dated Dec. 15, 2016).  Upon notification from Gater's counsel that the documents had been signed for and received by Defendants, on November 2, 2016, the Clerk of the Court noted delivery to Defendants on the docket.  *Id*. ¶¶ 34-37 and Ex. G. (2016 Action Docket Sheet dated Dec. 15, 2016).

On December 12, 2016, after none of the Defendants appeared in the Renewal Action for 193 days, the Clerk of the Court entered default against all Defendants.  2016 D.E. 20 (Clerk's Certificate of Default).  Another seven days elapsed without any appearance from the Defendants, and on December 15, 2016, Gater moved by Order to Show Cause for entry of a default judgment.  2016 D.E. 22 (Order to Show Cause).  On December 19, 2016, the Court

entered the Show Cause Order setting a January 23, 2017 deadline for any opposition and setting a January 26, 2017 hearing.  2016 D.E. 21 (Order to Show Cause).  Gater served the Show Cause Order and its accompanying papers on Moldovagaz on December 20, 2016.  2016 D.E. 24 (Affidavit of Service).

Defendants did not oppose the Show Cause Order or appear at the January 26, 2017 hearing.  Accordingly, the Court entered a default judgment against Gazsnabtranzit, Moldovagaz and Moldova in the amount of $27,405,766.18 on January 26, 2017 (the "**Renewal Judgment**"). 2016 D.E. 26 (Order and Default Judgment).  Gater served the Renewal Judgment on Moldovagaz through the Clerk of the Court in compliance with sections 1608(b)(3)(B) and 1608(e) of the FSIA.  2016 D.E. 28 (Memo Endorsement of Request for Service); *see also* 2016 D.E. dated February 15, 2017 (stating Clerk of the Court mailed copy of January 26, 2017 Order and Default Judgment with Romanian translation and affidavit of translation to Moldovagaz).

On February 27, 2017, counsel for Moldovagaz entered an appearance in the Renewal Action and simultaneously appealed from the Renewal Judgment.  2016 D.E. 31 (Notice of Appearance); 2016 D.E. 33 (Notice of Appeal).  After the Second Circuit set a briefing schedule for Moldovagaz's appeal, Moldovagaz filed a pre-motion conference request with this Court seeking leave to move to vacate the Renewal Judgment under Rule 60(b) of the Federal Rules of Civil Procedure.  2016 D.E. 37 (Pre Motion Conference Request).  On June 12, 2016, after Moldovagaz failed to file its brief when due in the Court of Appeals, the Second Circuit dismissed Moldovagaz's appeal.  2016 D.E. 51 (Mandate).  On June 21, 2017, the Court granted Moldovagaz leave to file its proposed Rule 60(b) motion.  2016 D.E. 44 (Order).

On September 22, 2017, the Court granted Gater's unopposed motion to vacate the Renewal Judgment under Rule 60(b)(6) to moot an appeal from the Renewal Judgment brought

10

by Moldova—thereby bringing all of the proceedings seeking to challenge the Renewal Judgment before this Court.  2016 D.E. 73 (Memo Endorsement).  The Court's order mooted Moldovagaz's then-pending motion to vacate the Renewal Judgment, and Moldovagaz agreed to withdraw its then-pending motion to vacate the 2000 Judgment, to be replaced with a new motion to vacate.  2016 D.E. 78 (Joint Status Letter (Nov. 13, 2017)).

On December 22, 2017, Moldovagaz filed the instant motion to dismiss the Complaint in the Renewal Action.  2016 D.E. 79-82.  And on December 26, 2017, Moldovagaz filed the instant motion to vacate the 2000 Judgment under Rule 60(b).  1999 D.E. 45-48.

## THE RELEVANT LEGAL STANDARDS

Rule 60(b) of the Federal Rules of Civil Procedure allows the Court to grant relief from a final judgment, order, or proceeding on six distinct grounds, provided the motion is timely made. In seeking vacatur of the 2000 Judgment, Moldovagaz invokes three of these:  Rule 60(b)(1) (permitting relief based on "mistake, inadvertence, surprise, or excusable neglect"); Rule 60(b)(4) (permitting relief "where the judgment is void"); and Rule 60(b)(6) (allowing relief for "any other reason that justifies relief.").  Fed. R. Civ. P. 60(b).  A defendant who has actual notice of the original proceeding but waits to contest the judgment through a Rule 60(b) motion bears the burden of showing that the judgment should be vacated.  *Grady v. Grady*, No. 10-CV-8809 (CS), 2015 WL 5052663, at *2 (S.D.N.Y. Aug. 26, 2015); *see also Burda Media, Inc. v. Viertel,* 417 F.3d 292, 299 (2d Cir. 2005).  Relief under Rule 60(b) "is addressed to the sound discretion of the district court."  *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 166 (2d Cir. 2004).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court may refer to jurisdictional evidence before the Court, and must consider such evidence if resolution of a proffered factual issue would result in the action's dismissal.  Fed. R. Civ. P.

12(b)(1); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001)).  The Court may hear conflicting evidence and resolve any factual issues necessary to satisfy itself that jurisdiction exists.  *See Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 630 (S.D.N.Y. 2005) (consulting expert evidence to resolve disputed issue of fact bearing on FSIA immunity), *aff'd*, 190 F. App'x 43 (2d Cir. 2006).

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff may defeat the motion by making a *prima facie* showing of jurisdiction through the complaint, supporting affidavits, and other evidentiary submissions.  Fed. R. Civ. P. 12(b)(2); *PDK Labs., Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  In addressing the motion, the Court must take all of the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993).

On a Rule 12(b)(5) motion to dismiss for insufficient service of process, the plaintiff has the burden of showing that service of process was adequate.  Fed. R. Civ. P. 12(b)(5); *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).  As noted above and below, the Court has already correctly determined that service of process was adequate in these cases.

## ARGUMENT

### I.  <u>Moldovagaz's Motion To Vacate The 2000 Judgment Is Untimely.</u>

Rule 60(c) provides that a motion under Rule 60(b) "must be made within a reasonable time"—and when brought under Rule 60(b)(1), no more than a year after entry of the judgment at issue.  Fed.R.Civ.P. 60(c).  Having deliberately slept on its rights to contest the 2000 Judgment in this Court for *17 years* with full knowledge of the proceedings that gave rise to that judgment, Moldovagaz's request to vacate the 2000 Judgment is patently unreasonable.

Moldovagaz's request to vacate the 2000 Judgment under Rule 60(b)(1) is unreasonable as a matter of law, as the one-year statute of limitations for such relief is absolute.  Fed. R. Civ.

P. 60(c)(1); *see also Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. For Contemporary Dance, Inc.*, 466 F.3d 97, 100 (2d Cir. 2006) (one year statute of limitations under Rule 60(c)(1) is absolute).  Similarly Moldovagaz's request to vacate the judgment pursuant to Rule 60(b)(6) is time-barred because a 17-year delay is patently unreasonable.  Indeed, the Second Circuit has found a delay of three-and-a-half years to be unreasonable for purposes of such relief.  *See Rodriguez v. Mitchell*, 252 F.3d 191, 201 (2d Cir. 2001) ("We do not think that three and one-half years from the date judgment was entered is a reasonable time.").

Finally, Moldovagaz's 17-year delay in seeking relief under Rule 60(b)(6) is also unreasonable.  And in any event, as discussed below, there is no basis for concluding—as Moldovagaz asserts—that the 2000 Judgment is void (or that the Court should dismiss the Renewal Action) for lack of jurisdiction.  As the Court properly determined over 17 years ago, and as Gater explains in the next two Sections, the Court had both subject matter jurisdiction over these proceedings and personal jurisdiction over Moldovagaz when it entered the 2000 Judgment, and still has both forms of jurisdiction today.

## II.     The Court Had Subject Matter Jurisdiction To Enter The 2000 Judgment And Continues To Have Subject Matter Jurisdiction Over Both Actions Today.

The sole basis on which Gater alleges that the Court has subject matter jurisdiction in either of these actions is the FSIA, which provides the only source of such jurisdiction over a foreign state, a state instrumentality or a state organ.  *See Blue Ridge Invs.*, *L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013) (FSIA is only source of subject matter jurisdiction over a foreign sovereign, or sovereign agency or instrumentality); 28 U.S.C. § 1603(b)(2) (defining sovereign agency or instrumentality to include "an organ of a foreign state").  Gater alleges that the FSIA applies to these actions because Moldovagaz is an organ of Moldova.  2016 D.E. 1 (Compl.), ¶¶ 5, 7; 1999 D.E. 1 (Petition) ¶¶ 3, 6.  Consequently, in order to defeat

Moldovagaz's motions, Gater demonstrates in Section II.A. below that Moldovagaz satisfies the five-factor test for determining if an entity is a state organ as articulated by the Second Circuit in *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004).[6]

However, as Moldovagaz correctly notes in its papers, it is not enough for Gater to show that the FSIA applies to its actions against Moldovagaz. To establish subject matter jurisdiction, Gater must also show that one of the exceptions to sovereign immunity set forth in section 1605 of the FSIA applies. 28 U.S.C. § 1605. As Gater explains in Section II.B. below, these actions fall within both the "arbitration" and "implied waiver" exceptions to immunity set forth in Section 1605(a) because (1) Gazsnabtranzit consented to an arbitration governed by an international agreement for the recognition of arbitral awards—specifically, the New York Convention—and thereby implicitly waived its sovereign immunity; (2) the Arbitral Award underlying these proceedings was rendered in that arbitration and is governed by the New York Convention; and (3) Moldovagaz succeeded to Gazsnabtranzit's obligation to satisfy that award and affirmatively signed on to the Underlying Agreement to arbitrate, and is therefore bound by Gazsnabtranzit implicit waiver of immunity.

A.    **Moldovagaz Meets The Criteria For A State Organ Under The *Filler* Test.**

Under *Filler v. Hanvit Bank*, whether an entity is a state organ—and thus a sovereign agency or instrumentality under section 1603(b)(2) of the FSIA—is governed by a five-factor test which looks to:

(1)    whether the foreign state created the entity for a national purpose;

(2)    whether the foreign state actively supervises the entity;

---

[6]    While there was sufficient evidence in the 1999 Action to support the Court's subject matter jurisdiction and personal jurisdiction in that proceeding, *see Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994), Gater is entitled to augment the record to oppose Moldovagaz's motion to vacate. *See Badian v. Brandaid Commc'ns Corp.*, No. 03 CIV. 2424 (DC), 2005 WL 1083807, at *1 (S.D.N.Y. May 9, 2005) (considering additional evidence presented by plaintiff opposing Rule 60(b) motion to vacate).

      (3)      whether the foreign state requires the hiring of public employees and pays their salaries;

      (4)      whether the entity holds exclusive rights to some right in the [foreign] country; and

      (5)      how the entity is treated under foreign state law.

*Filler*, 378 F.3d at 217.  No one *Filler* factor should be treated as dispositive.  *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 85 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305, 315-19 (2010).  Rather, "courts [should] engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor, or against, the entity claiming FSIA immunity." *Id.* (quoting *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005)).  All five factors are present here and weigh in favor of a determination that Moldovagaz is a state organ.

          1.      <u>Moldova Created Moldovagaz For A National Purpose.</u>

      As is explained both in the Statement of Facts above and in Professor Butler's Affidavit, Moldovagaz was created through the state-ordered merger of several Moldovan state organs—in particular, Gazsnabtranzit and SCM.[7]  Butler Aff. ¶¶ 18, 19.  Prior to this forced merger, both Gazsnabtranzit and SCM served national purposes of the Moldovan State.  Butler Aff. ¶¶ 20, 21. Gazsnabtranzit was a joint stock society created by Moldova for the national purposes of operating and developing the natural gas transit and distribution pipelines within Moldova, and paying certain debts of the Moldovan state.  Butler Aff. ¶¶ 13, 14, Ex. 5 (Gazsnabtransit Constitutive Contract (May 15, 1995)), Ex. 6 (Protocol (March 22, 1995)), and Ex. 7 (Decree

---

[7]    Gazsnabtranzit has not appeared in these actions to challenge Gater's allegation that it was also an organ of the Moldovan state.  In any case, Gazsnabtranzit's organ status is also clearly demonstrated by the evidence submitted by Gater.  *See e.g.*, Butler Aff. ¶¶ 13, 14, Ex. 5 (Gazsnabtranzit Constitutive Contract. (May 15, 1995)) (showing (<u>1</u>) national purpose of Gazsnabtranzit to operate and develop national gas pipelines and to pay debts of Moldova; (<u>2</u>) three out of six members of Management Board and Supervisory Committee were appointed by Moldova; and (<u>3</u>) Gazsnabtranzit's legal monopoly to operate gas pipelines).

302 (May 12, 1995)).  SCM functioned as an "organ of the Republic for the management of the unified gas supply system," (Butler Aff. ¶ 20 (quoting Ex. 11 (Edict No. 140 (May 18, 1994)))), and was required by law to participate in the preparation of agreements and contracts concerning the supply of gas and to be responsible for fulfilling Moldova's obligations under such agreements.  Butler Aff. ¶ 20, Ex. 12 (Decree No. 605 (Aug. 10, 1994)).

Moldovagaz inherited all of these obligations when it was created by Moldova through the merger of Gazsnabtranzit and SCM.  Butler Aff. ¶¶ 22, 23, Ex. 13 (Moldovan Civil Code, Art. 73.2).  Today it is a state-run monopoly enterprise that transports, distributes, and sells natural gas in Moldova.  Butler Aff. ¶ 40; Hranitzky Decl., Ex. 1 (JSC Moldovagaz Press Release (Sept. 18, 2010)); Ex. 2 (Decision of the Ministerial Council of the Energy Community (Dec. 5, 2012)).  It also maintains all pipelines in Moldova.  Butler Aff. ¶ 41, Ex. 19 (Decree No. 683 (June 18, 2004), and Ex. 20 (Constitutional Court Decision No. 17 (June 19, 2007)).

Notwithstanding this clear evidence, Moldovagaz contends, without support, that Moldova did not create Moldovagaz for a national purpose.  Moldovagaz Rule 60(b) Mem. at 9; Moldovagaz Rule 12 Mem. at 15.[8]  But apart from the conclusory, unsupported and self-serving assertion of its Vice President that Moldovagaz was not created for a national purpose, (2016 D.E. 81 (Cazacu Decl.) ¶ 7), Moldovagaz offers no evidence as to Moldovagaz's creation or its objectives to refute the evidence submitted by Gater.  The Court should therefore find that this factor weighs in Plaintiff's favor.  *See Murphy*, 421 F. Supp. 2d at 642 (finding "overwhelming evidence" that the entity was established for a national purpose where entity had been established

---

[8]  References to Moldovagaz's memorandum in support of its motion to vacate (1999 D.E. 48) are cited in this Memorandum as "**Moldovagaz Rule 60(b) Mem**," and references to Moldovagaz's memorandum in support of its motion to dismiss (2016 D.E. 82) are cited as "**Moldovagaz Rule 12 Mem.**"

by statute, and the statute set forth a national purpose to develop the nation's economy and financial industry).[9]

### 2. Moldova Supervises Moldovagaz.

The record demonstrates that Moldova not only supervises Moldovogaz, it completely dominates it. Moldovagaz's Charter requires that six of the nine members of Moldovagaz's Management Board—which is the executive body of the company—be appointed by and represent the interests of Moldova. Butler Aff. ¶ 31 and Ex. 14 (Moldovagaz Charter). More importantly, Moldova's state representative on Moldovagaz's Supervisory Board, Mr. Iurcu, enjoys a "super power" ***to cancel or reverse any decision of the executive management, the Management Board, the Council of Directors or the stockholders of Moldovagaz***. Butler Aff. ¶¶ 30, 33 and Ex. 21 (Decree No. 1053 (Nov. 11, 2010)). This super power to control effectively everything Molovagaz does on behalf of Moldova makes Moldovagaz not only an organ, but an alter ego of Moldova. *See First Nat'l City Banco Para el Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 614, 629 (1983) (an instrumentality is the alter ego of its parent state where it can be shown that the parent state controls its day-to-day operations).

The Supervisory Board of Moldovagaz oversees the Management Board. Butler Aff. Ex. 14 (Moldovagaz Charter, Art. 44). And two additional State representatives—Mr. Mamei and Ms. Demidchenko—supervise Moldovagaz through their participation in Moldovagaz's three-person Audit Commission. *Id*. ¶¶ 29, 34. Both of these individuals serve concurrently as Moldovan State officials. *Id*. ¶ 34.

---

[9]   The Second Circuit's decision in *In re: Vitamin C Antitrust Litigation* is inapplicable to Moldovagaz's pending motions. There, the Second Circuit deferred to a foreign state's interpretation of its own law. *See In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 189 (2d Cir. 2016), *cert. granted sub nom. Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, No. 16-1220, 2018 WL 386563 (U.S. Jan. 12, 2018). Moldovagaz is an organ, not a foreign state, and Cazacu is not a Moldovan State legal representative. And in any case the broad rule of deference articulated by the Second Circuit in that decision is now under review by the Supreme Court. *Id.*

Moldovagaz somewhat confusingly states that "[i]n Moldovagaz, [Moldova] is represented by the Ministry of Economy, which has been appointed a representative of the state in accordance with [Decree 1053]," and concedes that "the function of this representative is to protect the interests of the state in [] Moldovagaz."  Moldovagaz Rule 60(b) Mem. at 10; Moldovagaz Rule 12 Mem. at 16; 2016 D.E. 81 (Cazacu Decl.) ¶ 8.  However, it contends— without support—that the representative has no superior rights over other shareholders.  *Id.*  This contention is flatly contradicted by Decree No. 1053 and is therefore not credible.  *See* Butler Aff., Ex. 21 (Decree No. 1053 (Nov. 11, 2010); *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 Civ. 8833, 1998 WL 158958, *3 (S.D.N.Y. April 2, 1998) (party had failed to carry its burden of establishing French privilege law by submitting a declaration of French counsel without citations to authority).

Moldovagaz also argues that Moldova cannot independently control the activity of Moldovagaz because Moldova does not own a majority of the equity in Moldovagaz.  This contention both contradicts Decree No. 1053 and misstates the relevant *Filler* factor—which looks not to the state's ownership stake in the entity, but whether it enjoys supervisory authority over the entity.  *See Murphy*, 421 F. Supp. 2d at 643 (finding organ status in part because the Korean state actively supervised the organ through its election of the CEO, the appointment of its auditor, imposition of a governmental audit board, and the presence of government representatives on its management committee); *see also European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 145 (2d Cir. 2014) ("[A] foreign state actively supervises an organ when it appoints the organ's key officials and regulates some of the activities the organ can undertake."), *rev'd and remanded on other grounds*, 136 S. Ct. 2090 (2016).

3.     Moldova Directs Moldovagaz To Hire Moldovan State
Employees And Pays Those Employees' Salaries.

Contrary to Moldovagaz's unsupported contention, at least four employees with

management or supervisory authority over Moldovagaz are Moldovan state employees whose

salaries are paid by the state.  Butler Aff. ¶ 35 and Ex. 22 (Moldovagaz Controls).  Two of these

employees, Mr. Iurcu and Mr. Negura, are members of Moldovagaz's Management Board.

Butler Aff. ¶ 33 and Ex. 22 (Moldovagaz Controls).  The other two employees, Mr. Mamei and

Ms. Demidchenko, serve on Moldovagaz's Auditing Commission.  Butler Aff. ¶ 34 and Ex. 22

(Moldovagaz Controls).  Moldovagaz's unsupported claim that "Moldova does not require the

hiring of public employees and does not pay their salaries" is therefore not credible.

Moldovagaz Rule 60(b) Mem. at 9; Moldovagaz Rule 12 Mem. at 15.

4.     Moldovagaz Enjoys A Monopoly Over The Transport,
Distribution And Sale Of Natural Gas Within Moldova.

Moldovagaz enjoys a monopoly over the transport, distribution, and sale of natural gas

within Moldova.  Butler Aff. ¶ 40; Hranitzky Decl., Ex. 1 (JSC Moldovagaz Press Release (Sept.

22, 2010)); Ex. 2 (Decision of the Ministerial Council of the Energy Community (Dec. 5, 2012)).

The existence of this monopoly is well-documented, as Moldova undertook a public obligation to

terminate the monopoly and break up Moldovagaz by 2020 as a condition to its admission to the

European Union.  Hranitzky Decl., Ex. 2 (Decision of the Ministerial Council of the European

Union Energy Community (Dec. 5, 2012)).  Moldova Decree No. 683 also provides Moldovagaz

with the exclusive right to maintain all gas pipelines in Moldova, whether publicly or privately-

owned.  Butler Aff. ¶ 41 and Ex. 19 (Decree No. 683 (June 18, 2004)) and Ex. 20 (Constitutional

Court Decision No. 17 (June 19, 2007)).  *See Murphy*, 421 F. Supp. 2d at 644 (finding organ

status in part because entity had exclusive right to acquire and dispose of non-performing loans).

19

Moldovagaz does not even attempt to contest the existence of this state-imposed monopoly. Indeed, Mr. Cazacu's declaration makes no mention of the fact that the transportation, distribution, and sale of natural gas is Moldovagaz's core business. Ignoring both controling government decrees and relevant public statements regarding its monopoly status, Moldovagaz's submissions with regard to this factor are devoid of probative weight. *See Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 504-05 (S.D.N.Y. 2017) (rejecting defendants' correspondence that suggested ignorance of connection to the government of Iran as not credible where other evidence in the record showed otherwise).

5.   Moldovagaz Is Defined As A State Organ Under Moldovan Law.

Like each of the other factors, the final *Filler* factor also weighs in favor of a finding that Moldovagaz is a state organ. Indeed, under Moldovan law, Moldovagaz is described as an "organ" of Moldova responsible for the administration of the unified gas supply system as well as the "important state object" of pipeline maintenance within Moldova. *See* Butler Aff. ¶¶ 27, 42, Ex. 11 (Edict No. 140 (May 18, 1994)) and Ex. 20 (Constitutional Court Decision No. 17 (June 19, 2007)). Similarly, Moldovagaz's predecessor entity, SCM, functioned as an "organ of the Republic for the management of the unified gas supply system," and Moldovagaz inherited that function when it was created. Butler Aff. ¶¶ 20, 22-24, Ex. 11 (Edict No. 140 (May 18, 1994)), and Ex. 13 (Moldovan Civil Code, Art. 73.2). These facts, together with the fact that Moldovagaz was created for the purpose of paying Moldovan state debt; the fact that Moldovagaz has the exclusive right to maintain all gas pipelines in Moldova; the fact that a Moldovan state representative can overrule any decision of Moldovagaz's management, board of directors, and shareholders; and the fact that all of the property used by Moldovagaz is owned by the state, all further illustrate Moldova's treatment of Moldovagaz as a state organ. Butler Aff. ¶¶ 27, 29, 30, 42-44; Hranitzky Decl., Ex. 7 (Butler Aff. dated March 27, 2000, ¶¶ 19, 26). *See*

*Kirschenbaum*, 257 F. Supp. 3d at 534 ("An entity is an 'organ' if it is treated as part of the foreign state under its laws.")

In response, Moldovagaz again simply denies, without support, that it is an organ of Moldova.  Lacking any support, this denial also lacks probative force.

> 6.  The Fact That Moldova Does Not Own A Majority
>     Of The Equity In Moldovagaz Is Irrelevant.

Moldovagaz's reference to Gazprom's majority ownership of Moldovagaz is a red herring irrelevant to the organ inquiry.  Section 1603(b)(2) of the FSIA provides that an entity is an agency or instrumentality when it is *either* an organ of the state *or* majority-owned by the state.  Unlike the ownership analysis, *Filler*'s organ analysis looks to the control exerted by the sovereign over the entity rather than ownership.  *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004).  Indeed, "a foreign state need not have *any* ownership interest in an entity for it to be an 'organ' of that state."  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 5801607, at *7 (S.D.N.Y. Nov. 7, 2014) (emphasis added).  Nor is Moldovagaz's organ status affected by the fact that a majority stake in its majority stakeholder—Gazprom—is held by Russia.  *See* Hranitzky Decl., Ex. 5 (PJSC Gazprom) (showing Russia as the majority shareholder in Gazprom).  An entity owned directly or indirectly by more than one state can be an organ.  *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 147 (2d Cir. 2014) ("There is no logic to the proposition that an entity that serves as an organ of one foreign state cannot also serve as the organ of another."), *rev'd and remanded on other grounds*, 136 S. Ct. 2090 (2016).

> **B.  These Cases Fall Within The Arbitration And Implied
>     Waiver Exceptions To Sovereign Immunity.**

Having established that the FSIA applies to these cases because Moldovagaz is a state organ, Gater must also show that one of the exceptions to sovereign immunity set forth in section 1605 of the FSIA applies.  These actions fall within the arbitration exception set forth in 28

U.S.C. § 1605(a)(6) because (1) they relate to the confirmation of an arbitral award made

pursuant to the New York Convention, which is an "international agreement in force for the

United States calling for the recognition and enforcement of arbitral awards"; and (2)

Moldovagaz is bound by Gazsnabtranzit's agreement to arbitrate the dispute that led to the

Arbitral Award—and signed on to that agreement after the arbitration.  Both actions also fall

within the waiver exception to sovereign immunity set forth in 28 U.S.C. § 1605(a)(1) because

Gazsnabtranzit implicitly waived its immunity when it agreed to arbitrate the underlying dispute

and then participated in the arbitration, and Moldovagaz is bound by that waiver both as

Gazsnabtranzit's successor-in-interest, and as a signatory to the arbitration clause in the

Underlying Contract.

> 1.    These Actions Relate To The Confirmation Of An Arbitral
> Award Made Pursuant To The New York Convention.

The New York Convention applies to "the recognition and enforcement of arbitral awards

made in the territory of a State other than the State where the recognition and enforcement of

such awards are sought."  *See* Convention on the Recognition and Enforcement of Foreign

Arbitral Awards (the "**New York Convention**"), Art. I(1); 9 U.S.C. §§ 201 et seq. (codifying the

United States' obligations under the New York Convention).  The Convention requires that

"[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in

accordance with the rules of procedure of the territory where the award is relied upon[.]"  New

York Convention, Art. III.

Moldovagaz incorrectly argues that because Moldova had not entered into the New York

Convention when the Arbitral Award was issued, the New York Convention does not apply to

this proceeding.  Moldovagaz Rule 12 Mem. at 18; Moldovagaz 60(b) Mem. at 11.  Contrary to

Moldovagaz's argument, for purposes of determining whether the New York Convention

applies, it is the place where the arbitration took place and the award was issued—in this instance, Russia—that matters, not the nationality of the parties.  *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 93–94 (2d Cir. 1999) ("[T]he only State that must be a signatory to the Convention is the State where the arbitration is to take place."); *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 934 (D.C. Cir. 2007) ("the critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration.").

Here, the arbitration took place and the ICAC rendered the Arbitral Award in Moscow. Russia become a signatory state to the New York Convention decades before the arbitration commenced and the Award was issued.  *See* 2016 D.E. 80-14 (New York Convention Status Table) (showing the Russian Federation signed the New York Convention on December 29, 1958 and ratified it on August 24, 1960).  Thus, under the New York Convention, the Arbitral Award may be recognized and enforced in any other New York Convention State, including the United States.  New York Convention, Art. III; 9 U.S.C. § 201.

Proceedings seeking recognition or enforcement of an arbitral award governed by the New York Convention fall within the FSIA's arbitration exception to sovereign immunity, 28 U.S.C § 1605(a)(6).  *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 479 F. Supp. 2d 376, 380 (S.D.N.Y. 2007), *vacated and remanded on other grounds*, 582 F.3d 393 (2d Cir. 2009); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 151 (2d Cir. 2001).  Under that section, an organ enjoys no sovereign immunity in an action, "either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration . . . or to confirm an award made pursuant to

such an agreement to arbitrate, if … (B) the agreement or award is governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6)(B).  The arbitration exception applies to proceedings to enforce arbitral awards governed by the New York Convention, not only to proceedings to confirm them.  *See Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 116 (2d Cir. 2017) ("the FSIA explicitly contemplates the exercise of federal court jurisdiction over actions to enforce international arbitral awards against foreign sovereigns under the exemption from immunity provided by Section 1605(a)(6)").

> 2.    Moldovagaz Is Bound By Gazsnabtrazit's Agreement To Arbitrate.

The arbitration exception applies to Gater's actions against Moldovagaz because Moldovagaz is both (1) liable to satisfy the Arbitral Award, and (2) bound by Gazsnabtranzit's agreement to arbitrate the underlying dispute.  Where, as here, the successor-in-interest to an arbitral award governed by the New York Convention is bound by the agreement to arbitrate the dispute that led to the award, an action against the successor for recognition or enforcement of that award falls within the arbitration exception just as would an action against its predecessor.

Courts routinely find that a successor-in-interest is bound by its predecessor's agreement to arbitrate.  *See e.g.*, *Porzig v. Dresdner Kleinwort Benson N. Am. LLC*, No. 98 CIV. 7670 (BJS), 1999 WL 518833, at *5 n.5 (S.D.N.Y. July 21, 1999) ("The law is clear that an arbitration agreement may be enforced both by and against the successors-in-interest of the original signatories."); *Circus Prods., Inc. v. Int'l Impresarios, Inc*., No. 90 CIV. 0414 PKL, 1990 WL 55684, at *4 (S.D.N.Y. Apr. 26, 1990) (successor-in-interest inherited the arbitration provision from its predecessor's agreement when it succeeded to the rights of the underlying contract); *Lippus v. Dahlgren Mfg. Co*., 644 F. Supp. 1473, 1482 (E.D.N.Y. 1986) (finding it "beyond doubt" that successor-in-interest could enforce arbitration clause in agreement entered into by

predecessor).  And Moldovagaz is the successor-in-interest to all of the liabilities and obligations

of Gazsnabtranzit—including its agreement to arbitrate the Underlying Contract and the resulting

Arbitral Award—both under the express terms of its Charter, and under Moldovan law governing

the merger of juridical persons.  Butler Aff. ¶¶ 22-24; Ex. 14, (Moldovagaz Charter) and Ex. 13

(Moldovan Civil Code, Art. 73.2).  Moldovagaz's Charter expressly provides that it "shall be the

legal successor of [SCM] and [Gazsnabtranzit]."  Butler Aff. ¶ 23 and Ex. 14 (Moldovagaz

Charter).  In addition, under Article 73.2 of the Moldovan Civil Code, "the consequence of the

merger is the . . . full transfer of rights and obligations of the newly formed juridical person."

Butler Aff. ¶ 24 and Ex. 13 (Moldovan Civil Code, Art. 73.2).  Accordingly, when Moldovagaz

was formed, it succeeded to Gazsnabtranzit's obligations under the Underlying Contract, which

included an agreement to arbitrate before the ICAC.  Butler Aff. ¶ 25 and Ex. 15 (Underlying

Contract, Article 7.2 (Dec. 30, 1996)).

Moldovagaz's conduct following its formation confirms its assumption of

Gazsnabtranzit's obligations and liabilities.  On September 22, 1999, after the Arbitral Award

was rendered (on November 12, 1998) and before Lloyd's commenced the 1999 Action (on

December 10, 1999), Moldovagaz signed an addendum to the Underlying Contract.  Butler Aff.

¶ 25 and Ex. 16 (Underlying Contract, Addendum 6 (Sept. 22, 1999)).  That addendum provides

that Moldovagaz accepted all rights and obligations of Gazsnabtranzit under the Underlying

Contract, including the obligation to arbitrate in Moscow.  *Id*.

   3. Moldovagaz Implicitly Waived Sovereign Immunity
     As Gazsnabtranzit's Successor-In-Interest And
     By Binding Itself To The Underlying Contact.

When Moldovagaz bound itself to the arbitration agreement in the Underlying Contract—

which called for arbitration seated in the Russia, a signatory to the New York Convention—it

"had to have contemplated the involvement of the courts of any of the [other parties to the New

York Convention, including the United States] in an action to enforce the award."  *Seetransport Wiking Trader Schiffarhtsgesellschaft MbH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 579 (2d. Cir.1993).  Indeed, by the time Moldovagaz bound itself to the arbitration clause, Moldova itself had acceded to the New York Convention.  Butler Aff., Ex. 16 (Underlying Contract, Addendum 6 (Sept. 22, 1999); Hranitzky Decl., Ex. 9 (New York Convention, List of Contracting States); *see Seetransport*, 989 F.2d at 579 ("[L]ogically, as an instrumentality or agency of the Romanian Government—a signatory to the [New York] Convention—[the instrumentality] had to have contemplated the involvement of the courts of any of the Contracting States in an action to enforce the award.").  Accordingly, Moldovagaz "implicitly waived any sovereign immunity defense" when it signed on to the Underlying Agreement.  *Id.* 989 F.2d at 579.

The fact that Moldovagaz did not participate directly in the arbitration does not shield it from the consequences of its waiver, because as Gazsnabtranzit's legal successor-in-interest, it is deemed to have participated in the arbitration through Gazsnabtranzit.  *See id.* 989 F.2d at 576-79 (finding subject matter jurisdiction over the successor-in-interest of the entity that had signed the arbitration agreement and participated in the arbitration); *accord Campagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation*, 361 F.3d 676, 688 (2d. Cir. 2004) ("***Noga***") (imputing Russia's participation in arbitration to the Russian Federation where "no meaningful legal distinction" could be drawn between them); *Export Import Bank of the Republic of China v. Central Bank of Liberia*, No. L: 15-cv-09565, 2017 WL 1378271, *4 (S.D.N.Y. April 12, 2017), *appeal filed*, No. 17-1325 (2d. Cir.) (imputing waiver of immunity of the National Bank of Liberia to its legal successor-in-interest, the Central Bank of Liberia).

In *Seetransport*, the Second Circuit held that a Romanian instrumentality and its successor-in-interest implicitly waived sovereign immunity under circumstances similar to those present here.  989 F.2d at 579.  Navimpex was a Romanian shipbuilding company and instrumentality that entered into a contract with the German company Seetransport.  *Id.* at 574.  Navimpex failed to perform under the contract; Seetransport commenced an arbitration against it; and an arbitration panel seated in France entered an arbitral award in Seetransport's favor.  *Id.*  Romania subsequently dissolved Navimpex and transferred its assets and liabilities to a newly formed company, Uzinexportimport.  *Id.* at 574-75.  In the action to enforce the award against both Navimpex and Uzinexportimport, both entities argued that the district court lacked subject matter jurisdiction based on sovereign immunity.  *Id.* at 576.  The Second Circuit disagreed because when Navimpex entered a contract containing an arbitration provision, it should have known that it could be haled into the courts of any signatory to the New York Convention in proceedings to enforce the award.  *Id.* at 579.

In *Noga*, the Second Circuit addressed "whether a foreign arbitration award can be confirmed and enforced against a sovereign state where the arbitration agreement was signed by an organ of that nation's central government and where that organ—and not the nation itself—participated in the underlying arbitration proceedings." *Noga*, 361 F.3d at 678.  The court concluded because the government and the organ were "not separate 'parties' for the purposes of confirming an arbitral award under the [New York Convention]," the award could be enforced against the government even though it had not participated in the arbitration.  So too here, because Gazsnabtransit effectively became Moldovagaz upon Moldovagaz's creation, the two entities are in effect the same parties.

**III.**     <u>**The Court Has Personal Jurisdiction Over Moldovagaz In Both Actions.**</u>

In actions such as these where subject matter jurisdiction arises under the FSIA, personal jurisdiction over the defendant is established by service of process on the summons and complaint in compliance with section 1608 of the FSIA. *See* 28 U.S.C. §§ 1608 and 1330(b); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 104 (2d Cir. 2017) ("'Under the FSIA…personal jurisdiction [over a foreign sovereign] equals subject matter jurisdiction plus valid service of process.'") (citing *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1020 (2d Cir. 1991)). As Gater explains in Section III.A below (and as the Court has already determined), service on Moldovagaz was proper under the FSIA in both the 1999 Action and the Renewal Action.

The FSIA imposes no statutory requirement that the defendant have "minimum contacts" with the United States in order to establish personal jurisdiction. Rather, the only requirements the statute imposes concerning personal jurisdiction over the defendant relate to the state's consent to be sued in the United States (whether through waiver of its sovereign immunity, consenting to arbitrate a dispute governed by the New York Convention, or otherwise), and to service. 28 U.S.C. § 1608; 28 U.S.C. § 1330(b); *Mobil Cierro Negro, Ltd.* 863 F.3d at 104. Consequently, in cases governed by the FSIA, the only context in which a defendant's "minimum contacts" with the United States are relevant to the Court's personal jurisdiction is if the defendant is entitled to the protections of the Due Process Clause. As Gater explains in Section III.B below, however, a person or entity that has no connection whatsoever to the United States has no such due process rights. *See Corporacion Mexicana*, 832 F.3d at 102 ("The jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'"); *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 398 (2d Cir. 2009) (finding the lower court erred "by holding that foreign states

and their instrumentalities are entitled to the jurisdictional protections of the Due Process

Clause").  By its own admission, Moldovagaz has no such contacts.  Moldovagaz Rule 12 Mem.

at 24 ("Moldovagaz has had no contacts with either the forum state or the United States in

general."); Moldovagaz Rule 60(b) Mem. at 17 (same).

> **A.** **Moldovagaz Was Properly Served With Process**
> **In Both The 1999 Action and The 2016 Action.**

Section 1608(b) of the FSIA provides several methods of service on an agency,

instrumentality or organ of a foreign state.  Specifically, service may be made:

> (1) by delivery of a copy of the summons and complaint in accordance with
> any special arrangement for service between the plaintiff and the agency or
> instrumentality; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and
> complaint either to an officer, a managing or general agent, or to any other
> agent authorized by appointment or by law to receive service of process in the
> United States; or in accordance with an applicable international convention on
> service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), and if reasonably
> calculated to give actual notice, by delivery of a copy of the summons and
> complaint, together with a translation of each into the official language of the
> foreign state--
>
>> (A) as directed by an authority of the foreign state or political
>> subdivision in response to a letter rogatory or request or
>>
>> (B) by any form of mail requiring a signed receipt, to be addressed and
>> dispatched by the clerk of the court to the agency or instrumentality to be
>> served, or
>>
>> (C) as directed by order of the court consistent with the law of the place
>> where service is to be made.

28 U.S.C. § 1608(b)(1)-(3).  A plaintiff "must attempt service by the first method, or determine

that it is unavailable, before attempting subsequent methods in the order in which they are laid

out." *Harrison v. Republic of Sudan*, 802 F.3d 399, 403 (2d Cir. 2015) (discussing 28 U.S.C. §

1608).

1.      Service Of The 2016 Complaint Was Proper.

The Court has already determined that service on Moldovagaz in the Renewal Action

complied with section 1603(b) of the FSIA.  2016 D.E. 26 (Order and Default Judgment (Jan. 26,

2017)) (finding "a copy of the Summons and Complaint having been served on Defendants . . .

AO Moldovagaz . . .  on October 7, 2016 pursuant to 28 U.S.C. §§ 1608(a)(3) and 1608(b)(3)(B);

and proof of service on all defendant having been docketed by the Clerk pursuant to 28 U.S.C. §

1608(c)(2) on November 2, 2016").  This determination was correct.  First, as Gater has no

special arrangement for service on Moldovagaz in relation to these actions, section 1608(b)(1)

does not apply.  Having determined that that method was unavailable, Gater proceeded to

"delivery of a copy of the summons and complaint" in accordance with the Hague Convention,

which requires an "authority or judicial officer competent under the law of the State in which the

documents originate [to] forward to the Central Authority of the State addressed a request

conforming to the model annexed to the present Convention," with "the document to be served

or a copy thereof" annexed to the request.  Hague Convention, art. 3, Nov. 17, 1965, 20 U.S.T.

361; *see also* 28 U.S.C. § 1608(b)(2); 2016 D.E 23 (Jacob Aff.), ¶¶ 23-25.  On June 6, 2016,

Gater sent such a request to the Republic's Ministry of Justice, the Republic's designated Central

Authority for service under the Hague Convention.  2016 D.E. 23 (Jacob Aff.), ¶ 25.

Moldovagaz incorrectly contends that, as a private party, Gater could not request service

on Moldovagaz under Article 3 of the Hague Convention.  Moldovagaz Rule 12 Mem. at 29.

Article 3 requires an "authority or judicial officer competent under the law of the State in which

the documents originate" to initiate the request for service.  Hague Convention, art. 3.  In the

United States, "anyone who qualifies to serve process in the United States under Fed. R. Civ. P.

4(c)" is qualified to make a service request to the Central Authority of the receiving state.  *FRC

Int'l, Inc. v. Taifun Feuerloschgeratebau und Vertriebs GmbH*, No. 3:01 CV 7533, 2002 WL

31086104, at *9 (N.D. Ohio Sept. 4, 2002).  And Rule 4(c)(2) provides that "[a]ny person who is at least 18 years old and not a party may serve a summons or complaint."  Fed. R. Civ. P. 4(c)(2). Gater's Request for Service originated in the United States, and Gater served its Request for Service under the Hague Convention through Matthew Lyden, who attested to the fact that he was over 18 and not a party to the proceeding.  2016 D.E. 23-4, Ex. D (Lyden Aff. and Requests for Service).  In short, as the Court has already implicitly found, by complying with Rule 4(c), Gater complied with Article 3 of the Hague Convention.

Moldovagaz next protests that Gater's June 6, 2016 attempt at service was defective because Gater did not provide Romanian translations of the Summons and Complaint.  But "the failure to comply strictly with the Hague Convention is not automatically fatal to effective service." *Burda Media, Inc. v. Viertel,* 417 F.3d 292, 301 (2d Cir. 2005).  Moreover, to the extent the first attempt at service was defective, Gater cured any defect on August 11, 2016, when it sent the Summons, the Complaint, the prior Request for Service on Moldovagaz, and translations of those documents to the Minister of Justice.  2016 D.E. 23, (Jacob Aff.), ¶ 28. Because Gater cured any error within a "reasonable time," its service was proper under the Hague Convention.  *See Garg v. Winterthur*, 525 F. Supp. 2d 315, 323 (E.D.N.Y. 2007) (finding plaintiff cured any defect in the initial service by serving translated documents approximately six weeks after serving process through Switzerland's Central Authority).

When Moldova's Central Authority failed to return any certificate, Gater then turned to the next method of service under the FSIA—delivery of the Summons and Complaint, together with translations into Romanian, through mail "requiring a signed receipt, to be addressed and dispatched by the clerk of the court[.]"  28 U.S.C. § 1608(b)(3).  On October 3, 2016, the Clerk of the Court mailed the Summons, the Renewal Complaint, and their translations to Moldovagaz.

2016 D.E. 23, (Jacob Aff.), ¶ 33.  And on November 2, 2016, the Clerk of the Court certified that a returned receipt showing delivery on Moldovagaz had been received.  2016 D.E. dated November 2, 2016 (showing delivery to Moldovagaz).

Next, Moldovagaz appears to argue that Gater should have waited six months after making its first request for service before proceeding to an alternate method of service outlined under the FSIA.  Moldovagaz Rule 12 Mem. at 31 (arguing Gater "did not wait the requisite period before attempting to serve Moldovagaz with 'alternate methods'").  Yet section 1608 of the FSIA does not require the plaintiff to wait any particular amount of time following attempted service under one subsection before proceeding to service under the next subsection.  *See* 28 U.S.C. § 1608.  The only authority Moldovagaz cites to the contrary is the advisory notes to the Federal Rules of Civil Procedure, which do not and cannot override a statute like the FSIA.  Gater therefore did not need to wait six months after its June 2016 service attempt under section 1608(b)(2) before attempting service under section 1608(b)(3).

Finally, Moldovagaz claims that it lacked actual notice of the Renewal Action.  2016 D.E. 81 (Cazacu Decl.), ¶¶ 11-16.[10]  Yet on February 8, 2017, Gater's counsel received a letter from the Moldovan Ministry of Justice enclosing a letter dated December 15, 2016 from Moldovagaz stating that it did not accept the service documents sent by Gater, in part because the documents were not translated into Romanian.  Hranitzky Decl., Ex. 8 (Moldovagaz Letter and Hague Convention Certificate Translation (Dec. 15, 2016)).  This letter enclosed a return Hague Convention notice, which notes that documents *were* delivered to the legal representative of Moldovagaz, contrary to Mr. Cazacu's statement.  *Id.* (Moldovagaz Letter and Hague

---

[10]   Moldovagaz does not argue that it lacked notice of the 1999 Action.  Nor could it, since it participated in the Moldovan judicial proceeding to bar enforcement of the Arbitral Award and 2000 Default Judgment.  *See* Section II, *supra*.

Convention Certificate Translation (Dec. 15, 2016)).  It is therefore clear in the record that

Moldovagaz had actual notice of the Renewal Action.  *See Orix Fin. Servs. v. 1st Choice Freight*

*Sys., Inc.*, No. 03 Civ. 9296 (RMB), 2006 WL 2168332, at *4 (S.D.N.Y. July 31, 2006) (actual

notice mitigating factor in plaintiff's favor upon a defendant's Rule 60(b) motion to vacate).[11]

2.   Service Of The 1999 Petition Was Also Proper.

Moldovagaz's only objection to service of the petition in the 1999 Action is that it did not

comply with the Hague Convention.  Moldovagaz Rule 60(b) Mem. at 23.  But Moldova did not

accede to the Hague Convention until July 4, 2012—over twelve years after it was served with

the 1999 Petition.  *See* Hranitzky Decl., Ex. 6 (Hague Convention Status Table).  Consequently,

Lloyd's was not required to attempt service pursuant to the Hague Convention before attempting

service through the Clerk of the Court pursuant to 28 U.S.C. §1608(b)(3)(B).

As it is clear from the record that Lloyd's served Moldovagaz in accord with the FSIA

and that Moldovagaz had actual knowledge of the 1999 Action, Moldovagaz's objections here

must also fail.  *See* 1999 D.E. 10 (Certificate of Clerk of the Court attesting to service); Butler

Aff., Ex. 24 (Ex. 1 to Levintsa Aff. (Decision of Chisinau Tribunal (Jan. 15, 2001))

**B.   The "Minimum Contacts" Test Under the Due**
**Process Clause Does Not Apply to Moldovagaz.**

The Due Process Clause provides that "[n]o person . . . shall be . . . deprived of life,

liberty, or property, without due process of law . . ."  U.S. Const. amend. V.  Although domestic

corporations enjoy some protections afforded natural persons under this provision, a foreign

corporation like Moldovagaz that concededly has no connection to the United States (and is an

organ of a foreign state) cannot claim protections derived from the Due Process Clause in

---

[11]   In any case, even if this Court were to find that Moldovagaz lacked notice of the Renewal Action, any defect in service can be easily cured by re-service of process on Moldovagaz's counsel.  *See, e.g.*, *Orix Fin. Servs v. Phipps*, 2009 WL 2486012 (S.D.N.Y. Aug. 14, 2009) (directing plaintiff to serve defendant).

addition to the personal jurisdiction requirements imposed under the FSIA.  To establish personal jurisdiction over a foreign state, the FSIA already requires both that the state be served with process in accordance with section 1608, and a showing that the state either expressly or implicitly consented to be haled into the United States courts—whether by waiving its immunity from suit in the United States courts, consenting to arbitration in a state that is party to the New York Convention, engaging in commercial activity in the United States or otherwise.  *See* discussion in Sections II and III.A., *supra*.  With respect to such entities, Congress's authority is plenary:  the due process a state organ is entitled to receive is exactly what the statutory scheme set forth in the FSIA here requires, and no more.  Among other reasons, this is necessary to avoid creating a means by which such entities may avoid the legitimate consequences of their consent to the jurisdiction of the United States courts.

Because the requirements of the FSIA have been satisfied here, Moldovagaz's efforts to supplement the requirements of the FSIA with an additional "minimum contacts" requirement must fail.  In *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265-68 (1990), the Supreme Court noted that it has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."  *Id.* at 269 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950)).  The D.C. Circuit has likewise held that foreign entities without presence or property in the United States have no resort to the Due Process clause.  *Rasul v. Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009) ("[t]he Fifth Amendment does not extend to aliens or foreign entities without presence or property in the United States."); *Jifry v. F.A.A.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (same).  Although the D.C. and Second Circuits have each recognized that the availability of the Due Process Clause to a corporation owned by a foreign state is an unsettled issue, *see Frontera*, 582 F.3d at 401 (noting open issue regarding due

process protections for state-owned foreign entities); *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 302 n.* (D.C. Cir. 2005) (noting that the question whether a corporation owned by a foreign state was entitled to Due Process protections was "far from obvious"), there is no warrant for applying the Due Process Clause to an entity like Moldovagaz that lacks a significant voluntary connection with the United States as an overlay to the FSIA.[12]

In a similar vein, the Supreme Court has explained in the context of the Fourth Amendment that the text, drafting history, and contemporary interpretation of that Amendment indicate that it extends only to people with some connection to the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265-68 (1990).   As the Court explained, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271 (citing cases in which resident aliens were entitled to First, Fifth, and Sixth Amendment rights).   By contrast, a foreign alien with "no previous significant voluntary connection" with the United States cannot claim the Fourth Amendment's protections.  *Id.*  It is only aliens who are ***voluntarily*** present in the United States, "and presumably ha[ve] accepted some societal obligations," who are entitled to such protections.  *Id.* at 272-73.

In this case, Moldovagaz concedes that it has no voluntary presence in the United States. Moldovagaz Rule 12 Mem. at 24; Moldovagaz Rule 60(b) Mem. at 17.   Accordingly, it is not entitled to insist that FSIA be supplemented with constitutional requirements that neither the statute nor the Constitution impose.  *See also People's Mojahedin Org. of Iran v. U.S. Dep't of*

---

[12]   Furthermore, as noted in Section II.A.2 above, the extraordinary control exercised by Moldova over Moldovagaz through the "super power" enjoyed by its representative on Moldovagaz's Supervisory Board renders Moldovagaz Moldova's alter ego under *Bancec*. *Bancec*, 462 U.S. at 629.  It is well-established that neither a foreign state like Moldova, nor an alter ego of such a state, has any rights under the Due Process Clause.  *Frontera*, 582 F.3d at 400 (alter ego of a foreign state has no rights under the Due Process Clause); *TMR Energy*, 411 F.3d at 301 (same).

*State,* 182 F.3d 17, 22 (D.C. Cir. 1999) ("[a] foreign entity without property or presence in this country has no constitutional rights, due process or otherwise.").[13]

Finally, even if the Due Process Clause did have some application to Moldovagaz, there would be no justification for imposing a "minimum contacts" requirement on top of the due process protections already built into the FSIA.  As the Supreme Court has made clear, the requirements of the Due Process Clause concerning such things as notice, a right to be heard, or "minimum contacts" are not inexorably fixed.  *See Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950).  Rather, they apply in different ways in different settings and are subject to waiver by consent, express or implied.  As the Supreme Court has explained:

> [B]ecause the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court. . . . For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. . . . Where such forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, . . . their enforcement does not offend due process.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n. 14 (1985) (internal citations and quotations omitted).  Given the waivability of personal jurisdiction through express or implied consent, Moldovagaz cannot use the concept of "minimum contacts" to override the

---

[13]   The D.C. Circuit's decision in *GSS Group Ltd. v. Nat'l Port Authority*, 680 F.3d 805, 816 (D.C. Cir. 2012), *declined to extend by Corporacion Mexicana*, 832 F.3d at 104, is not to the contrary.  There a litigant seeking to confirm an arbitral award waived most of its arguments regarding the unavailability of due process rights to a foreign corporation owned by foreign sovereigns by failing to raise them in a timely manner in the district court.  The district court had applied a general standard relevant to foreign corporations, not one applicable to foreign corporations owed by sovereign states that had no contacts with the United States.  The D.C. Circuit observed that "GSS Group could have urged the [district] court to apply a different standard, but it failed to do so in a timely manner." *Id*. at 813.  The court noted the issue of the proper treatment of foreign corporations that had no contacts with the United States, but observed, among other things, that it had no occasion to resolve the matter or harmonize the various precedents because GSS Group had waived its right of argument, particularly any argument based on the Supreme Court's analysis in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). *Id*. at 817.  As noted above, however, Gater expressly cites and relies on *Verdugo-Urquidez*.  In addition, the D.C. Circuit felt bound by prior precedent within the circuit interpreting a different Supreme Court decision addressing the very different issue of the liability of a foreign corporation for the acts of its sovereign parent. *Id*.  The decision is thus distinguishable.

consequences of its consent to be bound by an arbitration clause subject to the New York

Convention, and defeat the intent of Congress in carefully crafting the scheme of due process

protections available to foreign sovereigns under the FSIA.

## IV.   Moldovagaz's *Forum Non Conveniens* Argument Fails As A Matter Of Law.

Moldovagaz cannot avail itself of the doctrine of *forum non conveniens* because it cannot

make the necessary showing that either Moldova or the Russian Federation is an adequate forum.

"To secure dismissal of an action on grounds of *forum non conveniens*, a movant **must**

demonstrate the availability of an adequate alternative forum."  *Id.* at 157 (emphasis added).  "It

is not sufficient that the alternative forum simply be shown to have jurisdiction over the matter.

If the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it

is no remedy at all, the district court may conclude that dismissal would not be in the interests of

justice."  *Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983) (internal

quotation marks omitted); *see also Albany Ins. Co. v. S/S "MAR ESMERALDA"*, No. 91 Civ.

1379 (MJL), 1992 WL 233875, at *2 (S.D.N.Y. Sept. 4, 1992) ("An adequate alternative forum

does not exist … where the alternative forum does not permit litigation of the subject matter of

the dispute, and where the remedy offered by the other forum is clearly unsatisfactory."

(emphasis added) (internal quotation marks omitted)).

This is most obvious with respect to Moldova, where Moldovagaz procured a court order

purporting to annul the Arbitral Award, thereby rendering either recognition or enforcement of

the award impossible in the Moldovan courts.  *See* Butler Aff. ¶¶ 48-49, 52 and Ex. 24 (Ex. 1 to

Levintsa Aff. (Decision of Chisinau Tribunal (Jan. 15, 2001)).  On January 15, 2001, after

holding proceedings with Moldovagaz's participation, the Chisinau Tribunal issued a decision

"refus[ing] to recognize and enforce in the territory of the Republic of Moldova the decision of

the International Commercial Arbitration in Moscow[.]"  Butler Aff., Ex. 24 (Ex. 1 to Levintsa

Aff. (Decision of Chisinau Tribunal (Jan. 15, 2001)).  Consequently, Moldova is *by definition* an inadequate alternative forum for the dispute.[14]  Because Moldovagaz cannot show that Moldova is an adequate forum, the Court need not consider whether public and private interest factors favor the Moldovan courts.  *See Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 218 (S.D.N.Y. 2011) (court's inquiry only proceeds to balancing "if an adequate alternative forum exists"); *see also Albany*, 1992 WL 233875, at *2 (denying motion to dismiss for forum non conveniens after finding no adequate alternative forum.

Moldovagaz has also failed to meet its burden of showing that the Russian courts would provide an adequate forum for these cases—offering only the unsupported, conclusory and inaccurate statement that "all parties are amenable to suit . . . in the Russian Federation." Moldovagaz Rule 60(b) Mem. at 25; Moldovagaz Rule 12 Mem. at 34.  However, even if Moldovagaz could make this mandatory threshold showing, its *forum non conveniens* argument would fail because the balance of public and private interest factors weighs in favor of this forum.  In recognition and enforcement proceedings such as this, "[u]nlike actions that may proceed to trial or require extensive access to witnesses or discovery, this dispute was decided in arbitration. … With respect to the private interests, … the summary nature of this proceeding significantly mitigates the burden on [defendant] of litigating in New York."  *Crescendo Mar. Co. v. Bank of Commc'ns Co.*, No. 15 CIV. 4481 (JFK), 2016 WL 750351, at *7-8 (S.D.N.Y.

---

[14]    Both of the cases Moldovagaz relies on for support that Moldova and Russia provide an adequate alternative forum are inapposite.  Moldovagaz Rule 60(b) Mem. at 24; Moldovagaz Rule 12 Mem. at 33.  *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) involved the application of a foreign statute, which could limit the "rate at which public funds may be disbursed to satisfy public obligations" in Peru.  *Id.* at 392.  Because only Peruvian courts were empowered to interpret and apply the statute, the Second Circuit held that the action was better suited in a Peruvian court.  *See id.*  In the second case, *Monegasque de Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 158 F. Supp. 2d 377 (S.D.N.Y. 2001), plaintiff had made conclusory allegations about corruption in the foreign forum.  *Id.* at *384.  In contrast to claims that the foreign forum "does not enjoy a reputable reputation," *id.*, Gater here alleges that it is precluded from obtaining any relief whatsoever in Moldova.

Feb. 22, 2016) (holding that a *forum non conveniens* dismissal was not warranted because "[u]nlike actions that may proceed to trial or require extensive access to witnesses or discovery, this dispute was decided in arbitration and all that remain[ed] [wa]s the relatively narrow issue of confirmation"); *see also Constellation*, 801 F. Supp. 2d at 220 (denying motion to dismiss because confirmation and enforcement actions can "proceed relatively easily, expeditiously, and inexpensively"). Moreover, this Court has presided over this litigation for nearly 19 years, whereas there is no evidence that the Russian Federation has had any connection to these disputes apart from the fact that a private arbitration took place in Moscow in 1998. *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 744 (S.D.N.Y. 2001) (defendant's failure to move to dismiss for *forum non conveniens* "until two and a half years after the action commenced further weakens its claim of inconvenience").

The Court may also dismiss Moldovagaz's argument that the public interest factors favor Russia. Moldovagaz Rule 12 Mem. at 36 (stating Russian courts appear no more congested than the Southern District of New York). "As a summary action, this case contributes only mildly to court congestion and imposes no burden on the local community in connection with jury duty." *Crescendo*, 2016 WL 750351, at *8.

Finally, having allowed this litigation to go on for nearly 19 years without appearing to object to the appropriateness of this forum, Moldovagaz's request that these actions be dismissed for *forum non conveniens* should be denied because Moldovagaz delayed unreasonably in bringing it. *See In re Air Crash Off Long Island New York, on July 17, 1996*, 65 F. Supp. 2d 207, 210 (S.D.N.Y. 1999) (*forum non conveniens* motion brought late in the litigation is disfavored "because a defendant's dilatoriness promotes and allows the very incurrence of costs and inconvenience the doctrine is meant to relieve.").

## CONCLUSION

For the foregoing reasons, the Court should deny Moldovagaz's motion to dismiss the

2016 Action and its motion to vacate the 2000 Judgment.

Dated: January 25, 2018
       New York, NY

DECHERT LLP
Dennis H. Hranitzky
G. Eric Brunstad, Jr.
May K. Chiang
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Gater Assets, Ltd.*